Filed 4/23/14  Taylor v. Long Beach Memorial Medical Center CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| RASHAWNA TAYLOR,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>LONG BEACH MEMORIAL MEDICAL CENTER,<br><br>　　Defendant and Appellant. | B240823, B242767<br><br>(Los Angeles County<br>Super. Ct. No. BC435221) |
| RASHAWNA TAYLOR,<br><br>　　Plaintiff and Appellant,<br><br>　　v.<br><br>LONG BEACH MEMORIAL MEDICAL CENTER,<br><br>　　Defendant and Respondent. | B244341<br><br>ORDER MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:[*]

　　IT IS HEREBY ORDERED that the opinion filed herein on March 27, 2014, be modified as follows:

On the title page, delete the last paragraph starting with "Alexander Krakow" and replace it with the following paragraph:

Alexander Krakow + Glick, J. Bernard Alexander III, Tracy L. Fehr; Law Offices of Twila S. White and Twila S. White for Plaintiff and Respondent and Plaintiff and Appellant.

There is no change in the judgment.

Filed 3/27/14 (unmodified version)

## **NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| RASHAWNA TAYLOR,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LONG BEACH MEMORIAL MEDICAL CENTER,<br><br>    Defendant and Appellant. | B240823, B242767<br><br>(Los Angeles County<br>Super. Ct. No. BC435221) |
| RASHAWNA TAYLOR,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LONG BEACH MEMORIAL MEDICAL CENTER,<br><br>    Defendant and Respondent. | B244341 |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Abraham Khan, Judge.  Affirmed in part; reversed in part and remanded.

Alexander Krakow + Glick, J. Bernard Alexander III and Tracy L. Fehr for Plaintiff and Respondent and Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Richard J. Simmons, Tracey A. Kennedy and Ruben D. Escalante for Defendant and Appellant and Defendant and Respondent.

\* \* \* \* \* \*

We are presented with three consolidated appeals following a jury verdict in favor of plaintiff Rashawna Taylor on claims related to her employment with defendant Long Beach Memorial Medical Center (LBMMC). In the first appeal, LBMMC challenges the judgment on various grounds. In the second appeal, LBMMC challenges the trial court's award of costs to Taylor. In the third appeal, Taylor challenges the trial court's award of attorney fees. We affirm the judgment and the awards of costs, but we reverse the award of attorney fees and remand for reconsideration consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Facts

Taylor was hired by LBMMC on March 30, 2007, as a licensed phlebotomist, a job requiring her to draw blood and obtain other specimens for the purpose of health assessments. During her probationary period, she worked at various draw stations associated with LBMMC located in the communities surrounding LBMMC. Once she became a full-time employee, she was assigned to the Elm Street location, close to LBMMC. After several months, she was transferred to the Naples location, where she was the only employee and worked regular hours of 8:30 a.m. until 5:00 p.m. Taylor's supervisor, Karen Maldonado, told her the Naples location would be a permanent assignment and Taylor remained there for the next two years.

Between 2007 and April 2009, Taylor was a reasonably good employee, although by no means perfect. For example, in July 2007, Maldonado gave Taylor a review and placed her on a development action plan to "[i]mprove on requisition completion," which improved by November 2007. In September 2007, Maldonado wrote in a performance review Taylor should "[e]liminate errors," "[s]harpen skills," and work with a phlebotomist coordinator. In April 2009, phlebotomist coordinator Sandra Rios

2

performed a routine check of Taylor's stock and reported to Maldonado that she saw a "sharps container full of uncapped needles. Also found 4 expired blood (1/09) culture bottles and 1 O&P kit. (3/09)." Shortly after, Taylor was given a disciplinary counseling memorandum for these errors, which she signed, although she wrote that she had "checked the O&P kits [and] they do not expire until 08 of 09 and 2010."

Taylor has a young daughter who was diagnosed with asthma in December 2007 after waking up in the middle of the night unable to breathe. Because she had to be taken to the hospital that night, Taylor called Maldonado and left a voicemail indicating she was at the hospital and would not be at work the next day.

Thereafter, Maldonado issued Taylor a verbal warning on January 25, 2008, regarding "unscheduled absences." According to LBMMC policy, an "unscheduled absence" is both not scheduled and not protected by law, and if an unscheduled absence is protected, it cannot be the subject of discipline. Taylor believed her absences were for her daughter's illness and protected, so she complained to her union president, who emailed LBMMC human resources operations director Elaine Garneff regarding the complaint.

On April 11, 2008, Taylor was given a written disciplinary counseling memorandum for seven unscheduled absences in nine months, one of which was the December 2007 trip to the emergency room with her daughter, marked on an absence log simply as "ill." Taylor again believed most of the absences were for her daughter's illness and protected, but when she tried to explain that to Maldonado, Maldonado told her it was Taylor's word against hers unless she had proof otherwise. The memorandum warned Taylor she could have no unscheduled absences for the next six months and further absences would result in additional discipline, including termination. Taylor interpreted the memorandum to mean she could not take another day off to care for her daughter. She again contacted her union president.

On April 17, 2008, Taylor was granted intermittent family leave related to her daughter's illness. She was granted a second intermittent leave in April 2009. Between

3

April 2008 and February 2011, Taylor was not subjected to formal discipline for taking time off.

The event that precipitated Taylor's lawsuit occurred on August 17, 2009, when Taylor awoke to find her daughter having trouble breathing and took her to the hospital. Taylor called Maldonado telling her she would not be in because she had to take her daughter to the doctor. Following the visit, Taylor had to administer breathing treatments to her daughter every hour, morning and night, until her daughter could breathe properly. As a result, Taylor was absent from work for five days.

Taylor claims she was subjected to a series of retaliatory acts by Maldonado when she returned to work. For example, prior to her absence, Taylor had always filled out the top portion of her time cards and Maldonado filled out the bottom portion before submitting them to payroll, and Taylor had always been given paid time off for her family leaves. For the week Taylor had been out caring for her daughter, Maldonado filled out her timecard improperly, so Taylor did not immediately get paid for her week off. When Taylor called Maldonado about the paycheck, Maldonado told her the error was Taylor's fault. However, Maldonado eventually apologized for the error, told Taylor she would fix it, and took steps to do so. Taylor also contacted the payroll manager, who agreed to issue Taylor a check. Taylor received the check a couple of weeks later. Maldonado's practice of completing timecards violated LBMMC policy, but she was never disciplined.

The week after Taylor returned to work from her absence and complained about her timecard, Maldonado transferred her to LBMMC's Spring location, approximately four miles from the Naples location, for "retraining" in "general things," including "customer service," even though Taylor's error rate was lower than 80 percent of other phlebotomists and she could have been trained without being moved from the Naples location. The Spring location was much busier than the Naples location, increasing the likelihood Taylor would make a mistake.

At the time, Maldonado claimed she had received patient complaints about Taylor's lack of customer service skills and a complaint from Rios about Taylor's

practices and upkeep of the Naples worksite. Maldonado explained in an email her intent was to place Taylor at a site with another phlebotomist: "I am going to temporarily move [Taylor] to a different site to work with an experienced phlebotomist for some retraining. [I] have done this recently with another phlebotomist and it is the usual practice for training new staff." Maldonado reiterated at trial the transfer was for "training reasons. It was patient safety. It was patient customer service reasons. It was just -- there were quite a few little things that just weren't quite up to snuff as they should be. She had been working by herself for quite a while with no contact with anybody else. So I thought it best if she worked alongside somebody for a while to see how things were done at other places. To brush up on things that she may not have come across." Ultimately, Taylor did not receive any retraining at the Spring location.

Taylor did not want to be transferred to the Spring location because she had established relationships with doctors and patients in the area of the Naples location, and the transfer altered her work schedule, which affected her ability to schedule childcare. During her two years at the Naples location, she worked from 8:30 a.m. to 5:00 p.m., and she had scheduled care of her daughter around those hours, including dropping her daughter off at preschool at 7:30 a.m., the earliest time the school would allow her to do so. But at the Spring location, every two weeks she was required to report to work one morning at 7:30 a.m. and one Saturday morning. At the time of the transfer, Maldonado explained she gave Taylor five weeks' notice and reminded her "all the other employees either work Saturdays now or have in the past (some sites are not open on Sat.)," and she could not "treat her any differently than anyone else."

Taylor complained to her union on September 3, 2009. Ten days later, Maldonado gave Taylor negative comments on her annual performance review, rating her the lowest score of "1" in four categories and noting "I have had several complaints from patients and staff regarding lack of customer service skills"; "Rashawna has been counseled regarding use and disposal of needles"; "does not attend voluntary meetings"; "does not acknowledge receipt of meeting minutes as required"; and needs "improvement in documentation completion." Taylor disagreed with some of these assessments. As for

5

document completion problems and customer service complaints, Taylor had never been informed those were issues. Taylor had not been informed of any safety issues following the uncapped needles incident. As for the voluntary meetings, on Taylor's annual review in 2008, Maldonado gave Taylor all high ratings while also noting Taylor did not attend staff meetings. By 2009, Taylor had stopped attending the meetings because they were after work hours and she had taken her daughter to one, after which Maldonado circulated a memorandum discouraging employees from bringing their children. Taylor admitted she did not sign and send back some of the minutes from the meetings she did not attend. Because she believed the review was incorrect, Taylor refused to sign it.

In light of her annual evaluation, Taylor was placed on a development action plan on September 15, 2009, which she also refused to sign because she believed it was in retaliation for her August 2009 leave. By December 2009, Maldonado reevaluated Taylor's performance and found the issues in the development action plan satisfied, but Taylor again refused to sign the document.

Taylor met with Maldonado, Garneff from human resources, and the union president on September 24, 2009. At the meeting, Taylor set forth the reasons why she felt Maldonado was retaliating against her, but Garneff talked over her and refused to look at her supporting documentation. Taylor complained the transfer to the Spring location was problematic because of her childcare arrangements, and when the union president asked whether Taylor had family leave, Maldonado said "yes," but Garneff gestured for her not to say anything more.

The next incident occurred on October 8, 2009, when Taylor failed to report to work at her scheduled time of 7:30 a.m. Taylor believed she could use "kin care" leave[1] for the time she missed. Maldonado testified Taylor told her she did not have childcare at that time, which did not qualify for kin care leave. After Taylor arrived at work,

---

[1] Under the "kin care" statute, employers who provide paid sick leave must allow employees to use a designated amount of "accrued and available" sick leave to care for a sick child, spouse, parent or domestic partner. (Lab. Code, § 233, subd. (a).)

Maldonado called her repeatedly, and when Taylor finally took one of the calls, Maldonado raised her voice and spoke in a demeaning manner. She told Taylor she was "disappointed" in her and was upset she was complaining to human resources. Taylor became upset and had another phlebotomist finish her current patient; after work she was not feeling well and went to urgent care. Her doctors removed her from work through October 12, 2009.

She returned to work on October 13, 2009, and again met with Maldonado, Garneff, and the union president. Nothing came out of that meeting: Maldonado began arguing with the union president because Maldonado wanted Taylor to make up the time she missed, and Garneff cut the meeting short.

Three days later on October 16, 2009, Taylor emailed Garneff, asking for help and claiming Maldonado was discriminating and retaliating against her for her August 2009 leave.

On October 22, 2009, Maldonado's supervisor Sandra Reese told Taylor she was to report to work at 7:30 a.m. the next day. Taylor wrote to Garneff in human resources, stating Maldonado told her to report to work the next day at 7:30 a.m. Garneff did not immediately respond to this message. Later in the day Maldonado changed Taylor's schedule back to 8:30 a.m., and Taylor wrote again to Garneff to complain about the schedule change. The next day, Taylor arrived at work at 8:30 a.m. per Maldonado's instructions, and she was issued a disciplinary counseling memorandum for arriving late both on that day and on October 8, 2009. Taylor again complained to human resources.

The next week, Maldonado transferred Taylor to the Los Alamitos location, which was six or seven miles from the Spring location. Maldonado claimed the transfer was due to another phlebotomist wanting to return to the Spring location and due to friction between Taylor and the other phlebotomist at the Spring location, Alisa Connor. Connor, however, could not recall any problems with Taylor. Taylor testified Maldonado told her she was transferred because Maldonado "was the supervisor and she felt like it." The transfer to the Los Alamitos location had an even greater impact on Taylor's childcare responsibilities because she was required to report to work one day every other week at

7

7:00 a.m., and on those days she would have to take her daughter to her mother's house in the opposite direction because her daughter's school did not open until 7:30 a.m. Maldonado was generally aware of this schedule. Taylor immediately complained to Garneff about the transfer. At the Los Alamitos location, Taylor received no retraining.

At some point, Maldonado told Taylor to get a work-related tuberculosis test during her lunch hour. Taylor complained to Garneff on October 29, 2009, and November 5, 2009. Garneff looked into Taylor's complaint and determined other technicians take the test on their lunch breaks.

Garneff investigated Taylor's complaints and met with Taylor and Taylor's coworkers Natasha Corona and Connor, as well as Maldonado and Rios. Garneff concluded Maldonado did not act wrongfully and met with Taylor on December 1, 2009, to discuss the results of her investigation.

Thereafter in January 2010, Maldonado transferred Taylor again, this time to the Cherry location, a block away from the Los Alamitos location. Maldonado claimed to have done so to accommodate requests from other phlebotomists to work together at Los Alamitos. Taylor's commute did not change as a result of this transfer and initially her start time was 8:30 a.m., although that changed and she was required to arrive at 8:00 a.m. In March 2010, Maldonado denied Taylor a day off, but indicated it was an error after Taylor complained to Garneff. Also in March 2010, Maldonado accused Taylor of mishandling a patient that had been seen by another phlebotomist. And in June and July 2010, Maldonado accused Taylor of two errors Taylor claimed were false, prompting Taylor to again complain to Garneff about retaliation.

Phlebotomist coordinator Rios testified that during 2009, she heard Maldonado make several negative comments about Taylor. Maldonado unpleasantly said seven or eight times that Taylor called out many times; she said two or three times she was "going to get rid of Ms. Rashawna Taylor," including once after a phone call from Taylor that she was calling out on family leave; she was "sick and tired of [Taylor] calling out" on family leave; she angrily called Taylor a "bitch" after the end of a phone call when

8

Taylor called out on family leave;[2] and she instructed Rios on several occasions to retrieve Taylor's file, which Maldonado reviewed for errors. In 2010, Maldonado also said she wanted to "get rid" of Taylor and instructed Rios to retrieve Taylor's file so she could find a way to do so.

Rios testified she was unaware of any other phlebotomist being transferred three times within a six-month period like Taylor was. She testified Maldonado used transfers to punish employees, such as Corona, who Maldonado transferred to a more inconvenient location following a protected leave. Likewise, Maldonado wanted to "get rid" of Nichole Stone and instructed Rios a couple of times to retrieve Stone's files to find errors, although Maldonado could not transfer her as planned because she quit.

LBMMC hired Attorney Katherine Edwards in October 2010 to investigate Taylor's complaints. She concluded no employees felt Maldonado had mistreated them. During the course of her investigation she did not interview Taylor or Rios because both were represented by counsel at the time.

In November 2010, there was a restructuring so Maldonado was no longer Taylor's supervisor. Nevertheless, by January 2011, Taylor was "barely hanging on" and moved back into her mother's home with her daughter. She left work on stress leave in February 2011. She was depressed, her hair started falling out, and she experienced physical pain, numbness, and headaches. Every time she tried to return to work, she would get sick, start shaking, and break out in rashes. By the time of trial, Taylor had not returned to work, although she was still employed by LBMMC.

## 2. *Procedure*

Taylor filed this lawsuit in April 2010 against LBMMC, Maldonado, and Maldonado's supervisor Reese, alleging 13 causes of action. By the end of trial, the jury was presented with six claims against LBMMC: (1) a violation of the California Family

---

[2] Maldonado had also called another employee a "bitch" after a "heated" phone call.

9

Rights Act (CFRA), Government Code section 12945.2;[3] (2) a violation of the kin care statute, Labor Code section 233; (3) retaliation in violation of the Fair Employment and Housing Act (FEHA), section 12940, subdivision (h); (4) associational discrimination in violation of the FEHA, section 12940, subdivision (a); (5) failure to take all reasonable and necessary steps to prevent associational harassment and discrimination in violation of the FEHA, section 12940, subdivision (k); and (6) negligent supervision. The jury found in favor of Taylor on her CFRA claim, her FEHA retaliation and failure to prevent claims, and her negligent supervision claim, awarding her $287,400 in damages as follows: $28,600 in past economic damages; $33,800 in future economic damages; $100,000 in past noneconomic damages; and $125,000 in future noneconomic damages. The trial court entered judgment accordingly. The trial court then denied LBMMC's motion for judgment notwithstanding the verdict (JNOV), or alternatively a new trial. LBMMC timely appealed the judgment and the order denying the motion.

Taylor filed a memorandum of costs, seeking more than $95,000. LBMMC filed a motion to tax costs, objecting to various categories. After a hearing, the trial court mostly denied the motion, but subtracted $6,820 in costs Taylor conceded should have been deducted, resulting in an award of $88,488.59. LBMMC timely appealed.

Taylor later filed a motion for attorney fees pursuant to the FEHA, section 12965, subdivision (b), seeking a "lodestar" amount of $1,675,627.50 with a 2.0 multiplier, for a total of $3,351,255. The trial court ultimately awarded her $484,687.50. Taylor timely appealed the award.

### DISCUSSION

**1. LBMMC's Challenges to the Judgment**

*A. Sufficiency of the Evidence*

LBMMC advances several challenges based on the sufficiency of the evidence. "Actions for unlawful discrimination and retaliation are inherently fact-driven, and we

---

[3] All further statutory references are to the Government Code unless otherwise noted.

10

recognize that it is the jury, and not the appellate court, that is charged with the obligation of determining the facts. Nonetheless, the jury's verdict stands only if it is supported by substantial evidence. 'In determining whether a judgment is supported by substantial evidence, we may not confine our consideration to isolated bits of evidence, but must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court. [Citation.] We may not substitute our view of the correct findings for those of the trial court [or jury]; rather, we must accept any reasonable interpretation of the evidence which supports the [factfinder's] decision. However, we may not defer to that decision entirely. "[I]f the word 'substantial' means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." [Citations.]'" (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389 (*McRae*); see also *Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1218-1219 (*Joaquin*).)

*i. Adverse Employment Action*

LBMMC argues the evidence was insufficient to demonstrate Taylor was subjected to an "adverse employment action," a requirement for both her FEHA and CFRA claims. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1049 (*Yanowitz*) [FEHA]; *Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 261 (*Dudley*) [CFRA].)[4] *Yanowitz* is the touchstone case interpreting the adverse

---

[4] Under the FEHA employers may not "discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (§ 12940, subd. (h).) The CFRA prevents an employer from refusing to grant up to 12 weeks of family leave to an employee who has been employed for more than one year and who worked at least 1,250 hours in the preceding 12 months.

11

employment action requirement, cogently summarized by Division Four in this District: "In order to meet the FEHA standard, an employer's adverse treatment must 'materially affect the terms, conditions, or privileges of employment.' [Citation.] '[T]he determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim.' [Citation.] Such a determination 'is not, by its nature, susceptible to a mathematically precise test.' [Citation.] 'Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of sections 12940(a) and 12940(h).' [Citation.] FEHA not only protects against 'ultimate employment actions such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement . . . .' [Citation.] Actionable retaliation need not be carried out in 'one swift blow,' but rather may be 'a series of subtle, yet damaging, injuries.' [Citation.] Thus, each alleged retaliatory act need not constitute an adverse employment action in and of itself, and the totality of the

_____

(§ 12945.2, subd. (a).) The CFRA also makes it "an unlawful employment practice for an employer to refuse to hire, or to discharge, fine, suspend, expel, or discriminate against, any individual because of any of the following: [¶] (1) An individual's exercise of the right to family care and medical leave provided by subdivision (a). [¶] (2) An individual's giving information or testimony as to his or her own family care and medical leave, or another's person's family care and medical leave, in any inquiry or proceeding related to rights guaranteed under this section." (§ 12945.2, subd. (*l*).).

12

circumstances must be considered.  [Citation.]"  (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 298 (*McCoy*).)

Taylor argues the evidence demonstrated she was subjected to a course of retaliatory conduct that materially affected the terms and conditions of her employment when she returned from protected leave in August 2009:  half of her paycheck was delayed for two weeks; she was given an undeserved negative performance evaluation and development action plan in September 2009 and was falsely accused of other errors in 2009 and 2010; she was given an undeserved written reprimand for arriving at work late on two occasions in October 2009; she was transferred to three locations within six months and given an altered schedule, which interfered with her childcare responsibilities as a single mother; she was ignored when she complained; and she was forced to take a work-related tuberculosis test during her lunch hour.[5]  While individually these acts may not have constituted actionable adverse employment actions, considering them together and in the context of Taylor's employment, as we must, we find sufficient evidence supported the jury's verdict.  (*Yanowitz, supra*, 36 Cal.4th at pp. 1053, 1056.)

In arguing Taylor was not subject to an adverse employment action, LBMMC isolates and attacks each alleged act, claiming none of them amounted to an actionable adverse employment action.  But *Yanowitz* expressly forbids that approach and we reject it here.  In any case, most of LBMMC's attacks simply emphasize its own evidence, which we must assume the jury rejected in evaluating whether substantial evidence supported the verdict.  (*McRae, supra*, 142 Cal.App.4th at p. 389.)

---

[5]    Taylor also cites her discipline in April 2008 for excessive absences, but LBMMC presented unrebutted evidence those absences were not protected as either CFRA leave or kin care leave.  (§ 12945.2; Lab. Code, § 233.)  Taylor would not have been eligible for leave under the CFRA until she had been employed for one year, and she did not work for LBMMC for one year until March 30, 2008.  Taylor was not eligible for kin care leave because she did not have sufficient paid time off to cover all the dates she was out as required by the kin care statute.  (Lab. Code, § 233.)

13

LBMMC also attempts to analogize to a series of cases that found no adverse employment action based on the facts presented in those cases, but we find its arguments unpersuasive. As *Yanowitz* emphasized, "[r]etaliation claims are inherently fact-specific, and the impact of an employer's action in a particular case must be evaluated in context. Accordingly, although an adverse employment action must materially affect the terms, conditions, or privileges of employment to be actionable, the determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim." (*Yanowitz, supra*, 36 Cal.4th at p. 1052.)

Taylor was a single mother who depended on a predictable schedule in order to care for her asthmatic daughter. When she took protected leave to care for her daughter, she was subject to harsher unfounded criticism, three transfers in six months that imposed more onerous schedules interfering with her childcare, and an instance of delayed pay. All of these acts were undertaken by Maldonado, who was "sick and tired of [Taylor] calling out" on family leave, called Taylor a "bitch," proclaimed she wanted to "get rid of" Taylor after Taylor called out on family leave, and reviewed Taylor's file to find errors to do so. And when Taylor complained, she was frequently rebuffed. This course of conduct caused Taylor such severe stress she took a leave of absence and was physically unable to return to work, even when Maldonado was no longer her supervisor. Under these circumstances, the jury was entitled to conclude these acts materially altered the conditions of Taylor's employment and constituted an adverse employment action.

*ii. Retaliatory Animus*

LBMMC argues insufficient evidence supported the jury's verdict that LBMMC took any adverse employment actions with retaliatory animus, another requirement under both the FEHA and the CFRA. (*Joaquin, supra*, 202 Cal.App.4th at p. 1220; *Dudley, supra*, 90 Cal.App.4th at p. 264.) This argument is meritless. Maldonado's negative comments about Taylor's leave, including saying she wanted to "get rid" of Taylor and reviewing her file for mistakes after Taylor took family leave, were direct evidence of retaliatory animus. Further, Maldonado's actions came close in time after Taylor's

14

August 2009 leave and complaints about retaliation, providing circumstantial evidence of retaliatory intent. (*Taylor v. City of Los Angeles Dept. of Water & Power* (2006) 144 Cal.App.4th 1216, 1235, overruled on another ground by *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1173-1174; *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 480.) And there was evidence that at least some of Maldonado's justifications for adverse actions were unworthy of belief, such as evidence that Taylor was transferred to the Spring location for "retraining," even though Taylor's performance was better than 80 percent of other phlebotomists, she could have been trained at the Naples location, and she did not receive any retraining at the Spring location. Maldonado had used transfers to punish employees in the past who took protected family leave, although she had not subjected other employees to three transfers in six months as she did Taylor. This was sufficient evidence to support the jury's verdict of retaliatory animus.

*iii. Failure to Prevent Retaliation*

Under the FEHA, it is unlawful for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." (§ 12940, subd. (k).) This provision applies to retaliation claims as well. (*Taylor, supra*, 144 Cal.App.4th at pp. 1239-1240.) "[A]ll reasonable steps" include promptly investigating complaints and adopting and implementing appropriate personnel policies and procedures. (*California Fair Employment & Housing Com. v. Gemini Aluminum Corp.* (2004) 122 Cal.App.4th 1004, 1024-1025.)

LBMMC contends insufficient evidence supported the jury's verdict it failed to prevent retaliation. We disagree. Even though LBMMC had nondiscrimination, nonharassment, and attendance policies preventing employees from being disciplined from unscheduled protected absences, and it took some steps to investigate Taylor's repeated complaints about Maldonado's retaliatory conduct, the jury was entitled to find LBMMC's efforts to prevent retaliation insufficient. For example, human resources conducted training on the leave policies, but the training was not mandatory and Garneff did not know whether Maldonado attended. Also, when Taylor's pay was delayed upon

15

her return from her August 2009 leave, it came to light that Maldonado was completing employees' timecards in violation of LBMMC policy, which gave her the opportunity to incorrectly record the status of Taylor's leave, but Maldonado was never disciplined. Garneff testified Taylor had not complained about retaliation until the end of October 2009, whereas Taylor had complained to Garneff at least twice beginning in September 2009, to no avail. Moreover, during one meeting with Taylor, Garneff talked over her and would not look at her supporting documentation. And Garneff accepted Maldonado's justification for transferring Taylor to the Spring location for retraining, although a brief investigation could have revealed Taylor received no retraining there and Taylor could have been retrained at the Naples location, bringing into question Maldonado's justification. Finally, at least one aspect of Garneff's investigation turned out to be false: Garneff noted that Connor, Taylor's coworker at the Spring location, stated Taylor was disorganized and had expired items at the Naples location, whereas Connor testified she never made those statements. On this record, sufficient evidence supported the jury's finding LBMMC failed to take reasonable steps to prevent retaliation.

*iv. Negligent Supervision*

LBMMC argues insufficient evidence supported the jury's verdict that Maldonado was "unfit" or "incompetent," as required for Taylor's negligent supervision claim. (*Diaz v. Carcamo* (2011) 51 Cal.4th 1148, 1157.) LBMMC also attacks the jury's verdict on this claim on several other theories. In light of our conclusions above, we need not address any of these arguments because LBMMC cannot show "'a reasonable probability that in the absence of the error, a result more favorable to [it] would have been reached.'" (*Id.* at p. 1161.) We have found sufficient evidence supported the jury's verdict finding LBMMC liable for Taylor's CFRA and FEHA claims, and LBMMC has pointed to no additional evidence that was admitted to support Taylor's negligent supervision claim separate from her CFRA and FEHA claims or that the jury would have awarded less in damages absent this additional claim. (Cf. *Diaz*, at pp. 1161-1162 [refusal to dismiss superfluous negligent hiring claim was prejudicial because evidence of employee-driver's

16

prior accidents and poor employment record would not have been admitted when employer admitted vicarious liability; it was also reasonably probable allocation of fault would have been different absent negligent hiring claim].)  Thus, even if insufficient evidence supported this claim or the trial court erred in allowing this claim to go to the jury, LBMMC suffered no prejudice from the jury finding for Taylor on this claim.

*v.  Economic Damages*

LBMMC argues insufficient evidence supported the jury's award of economic damages of $28,600 in lost backpay and $33,800 in lost front pay because Taylor failed to establish she was "constructively discharged" and she failed to introduce evidence to support the jury's calculations.  We disagree on both points.  "[A]n award of damages will not be disturbed if it is supported by substantial evidence.  [Citations.]  The evidence is insufficient to support a damage award only when no reasonable interpretation of the record supports the figure.  [Citation.]"  (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 691.)

As to LBMMC's "constructive discharge" theory, Taylor concedes she did not argue or present evidence she was constructively discharged (indeed, she remained employed with LBMMC at the time of trial), but she was not required to in order to recover lost wages.  "FEHA does not limit damages and 'all forms of relief granted to civil litigants generally . . . are available . . .' regardless of whether the party aggrieved was constructively discharged."  (*McCoy, supra*, 216 Cal.App.4th at p. 308; see *Cloud v. Casey* (1999) 76 Cal.App.4th 895, 909.)

On the sufficiency of the evidence of lost wages, Taylor introduced her timecards into evidence, demonstrating she usually worked a 40-hour work week.  She inexplicably failed to introduce any full pay stubs into evidence, and the only evidence of her pay rate was the delayed partial check specially issued to her for her August 2009 leave.  Still, it showed at the time she made $647.20 gross for 40 hours of work, which she suggested

17

was half her regular paycheck.[6]  The time between Taylor going out on leave in February 2011 and the December 16, 2011 verdict was roughly 45 weeks, and multiplying Taylor's gross weekly pay by that time period yields backpay close to the jury's $28,600 award. This evidence was sufficient to support the jury's backpay award.

Based on this same methodology, the jury's $33,800 front pay award represented approximately 52.2 weeks, or just over one year, of gross pay.  Taylor testified Maldonado's retaliatory acts against her caused her such severe stress that when she tried to return to work at LBMMC, even without Maldonado as her supervisor, she was physically unable to do so.  Her medical expert diagnosed her with an adjustment disorder with anxious mood that progressed to a major depressive disorder caused by the conduct she experienced at work.  He testified in order for Taylor to return to work, she would need to feel "some job security," be treated "in an equivalent way to other phlebotomists," and be able to "discharge her duties as a phlebotomist."  He recommended she have therapy sessions once per week for 18 to 24 months.  Taylor's counsel also argued in closing the jury should give her six months to a year in front pay to find a new job.  The jury was entitled to infer from this evidence that one year of front pay would give Taylor sufficient time to overcome her psychological symptoms and return to work or secure other employment.  Sufficient evidence supported this award.

## B.  Admission of "Me Too" Evidence

LBMMC moved in limine to exclude all evidence of employment-related complaints by any current or former employees supervised by Maldonado (so-called "me too" evidence), arguing the evidence was irrelevant, constituted improper character evidence, would confuse the issues, and was unduly prejudicial.  The trial court denied the motion because, as pertinent here, the evidence could be relevant to "show intent or motive, for the purpose of casting doubt on an employer's stated reason for an adverse

---

[6]  Although Taylor did not testify this was her wage at the time she took leave in February 2011, LBMMC has not identified any evidence that Taylor's wage went *down* during this time.  The jury was therefore entitled to infer her pay rate did not change.

18

employment action." (*Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 760 (*Johnson*); see also *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 114-115 (*Pantoja*).) LBMMC argues the trial court prejudicially erred in admitting Taylor's "me too" evidence. We disagree.

The trial court enjoys "'broad authority' over the admission and exclusion of evidence," and "[w]e review a trial court's ruling on a motion in limine to exclude evidence for an abuse of discretion. [Citations.] The trial court's authority is particularly broad 'with respect to rulings that turn on the relevance of the proffered evidence.' [Citation.] Furthermore, '[i]t is for the trial court, in its discretion, to determine whether the probative value of the relevant evidence is outweighed by a substantial danger of undue prejudice. The appellate court may not interfere with the trial court's determination . . . unless the trial court's determination was beyond the bounds of reason and resulted in a manifest miscarriage of justice.' [Citation.]" (*McCoy, supra*, 216 Cal.App.4th at pp. 295-296.)

Evidence Code section 1101, subdivision (a) provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." But subdivision (b) of that section creates an exception to that prohibition: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." Courts have approved the admission of "me too" evidence in employment discrimination cases under Evidence Code section, subdivision (b) on the theory that it is relevant to an employer's motive for discrimination and whether an employer's proffered reason for an adverse action is pretext. (*Johnson, supra*, 173 Cal.App.4th at pp. 761-767; see also *Pantoja, supra*, 198 Cal.App.4th at p. 114; see also *McCoy, supra*, 216 Cal.App.4th at p. 297.) "Me too" evidence could also be relevant as "operative facts" of an employer's knowledge of a supervisor's actions and complaints

19

from employees, which could support failure to prevent and negligent supervision claims. (*Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 988-989 (*Bihun*), disapproved on other grounds by *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664.)

At trial, Taylor offered "me too" testimony from the following current or former employees of LBMMC as circumstantial proof of Maldonado's retaliatory animus and as proof of LBMMC's knowledge of Maldonado's retaliatory conduct: Micaiah Tafai, Nichole Stone, Artra Lee, Decora Owens, Carmencita Rodriguez, Connor, and Rios.[7]

Tafai worked for LBMMC for just over one year, from October 2007 until December 2008 when she was terminated; Maldonado supervised her during that time. When she was hired she was pregnant, and Maldonado disciplined her for absences related to her pregnancy and related heart condition. She informed Reese (Maldonado's supervisor) about her absences, who told her it was "illegal . . . to be written up" based on her health condition. She took maternity leave in June 2008, and, due to an injury during birth, she did not immediately return to work. When she inquired about returning in November 2008, she was informed that Maldonado had filled her position and no other positions were available, even though she understood from human resources she had six months of leave before her position could be filled.

Stone[8] worked for LBMMC for just over two years, from October 2006 to November 2008 when she resigned; Maldonado supervised her during that time. Although she thought Maldonado was "fine," she had an issue with Maldonado and absences on several occasions. On one occasion, Stone received a call at work that her

---

**7** Several of these witnesses also testified to other matters apart from "me too" evidence. Because LBMMC has not challenged that testimony on appeal, we will not discuss it.

**8** At trial, the court allowed Stone to testify in part because LBMMC had opened the door to her testimony through questioning Maldonado on Stone's employment. LBMMC has not challenged that ruling on appeal.

infant daughter had a fever, and she was required to leave immediately. Maldonado ordered her to report to her office first, and Maldonado issued her a written reprimand for the absence, stating Stone could have no further unscheduled absences. At the time, Maldonado did not explain to Stone the difference between protected and unprotected leave. On another occasion, Stone's husband called Maldonado to report Stone's mother-in-law had suffered a seizure, but Maldonado never relayed the message to Stone and later told Stone there was no coverage for her if she left. Stone had four children, two of whom had asthma, and she was absent frequently to care for them; Maldonado knew her situation and told her she was having too many absences. Maldonado also transferred her to different locations after telling her she had too many absences. And Maldonado caused her stress by complaining about her work and talking to her in an inappropriate way on one occasion. Just before Stone resigned, Maldonado issued her another disciplinary memorandum for absences, on which Stone wrote that most of the absences were for "doctor reasons" and she had documentation, although Maldonado never asked for any documents.

At the time of trial, Lee was a current LBMMC employee and had been for 11 years; five of those years she was supervised by Maldonado. She had more than six labeling errors and had been suspended at least twice, and perhaps three times, but during those suspensions she was never told she needed to be transferred or retrained. Ultimately she was transferred from the Columbia location where she had been for five years as an alternative selected by Maldonado when someone in human resources wanted to terminate Lee. She had seven children, and she had been disciplined for unscheduled absences related to her children. Maldonado never explained she could take CFRA and kin care leave. Maldonado did not give her a "hard time" about absences and Lee did not feel as if her transfer was punishment. Apart from her absences, Lee complained to Maldonado about safety issues and her suspension based on "secondhand" information.

Owens was hired in September 2008 and was supervised by Maldonado until April 2011. Maldonado knew she had a young daughter and she had issues picking up her daughter; Maldonado simply responded she needed to have a backup at those times.

21

When Owens worked at LBMMC's Termino location, which was close to her home, Maldonado told her she could "pretty much make [her]self comfortable" because she would be there permanently. But she was transferred around the same time she had a "kin care issue," although she admitted she did not have paid time off to use for kin care leave at that time. Maldonado also issued her two disciplinary counseling memoranda for absences, some of which Owens claimed were "kin care," and at the time Maldonado did not explain what constituted an unscheduled absence. Eventually Owens spoke with Rios complaining about kin care issues with Maldonado. Owens also testified Maldonado threatened her with a transfer when she reported to work late. And after she had been out on medical leave she faxed Maldonado a doctor's note, and a few hours later, Maldonado gave her the option of transferring to the Columbia location, although Owens felt she did not have a choice. She also felt the transfer would interfere with her childcare responsibilities.

At the time of trial, Rodriguez was a current LBMMC employee and had been for almost 12 years; five of those years she was supervised by Maldonado. She testified she had taken kin care and family leave and had never been disciplined for it. She claimed she was falsely disciplined for having expired items when she was on bereavement leave, but she did not believe the discipline was retaliation for taking leave.

Connor worked for LBMMC since 2004 and was supervised by Maldonado from that time until 2011. She testified she attempted to use paid time off for kin care or family leave, and Maldonado told her she did not have paid time off available, but when she contacted the payroll department, she discovered she did have paid time off. She did not believe Maldonado ever mistreated her.

Rios was not a traditional "me too" witness like the other employees who testified. She worked for LBMMC for seven years and was a phlebotomist coordinator for four of those years, reporting to Maldonado. She resigned as coordinator because she was doing work that was not hers and doing things she believed were unethical, such as searching for information on employees so Maldonado could retaliate against them. She did not identify any adverse acts taken by Maldonado against her personally, but she had

22

personal knowledge of the treatment of other employees. For example, she heard Maldonado make "negative comments" about two employees, Corona and Stone. She knew Maldonado also intended to transfer several employees as punishment and in fact transferred Corona to a more inconvenient location following a protected leave. She heard Maldonado say she wanted to "get rid" of Stone and instructed Rios a couple of times to retrieve errors in her file, but Stone quit before Maldonado could transfer her. Rios also suggested Maldonado might have blocked Stone's efforts to get rehired and Maldonado called Rodriguez a "bitch."

With one exception,[9] the trial court did not abuse its discretion in admitting this evidence. It was not improper character evidence; instead, Maldonado's treatment of other employees when they took family leave was circumstantial evidence of whether Maldonado harbored retaliatory animus against Taylor. (*McCoy, supra*, 216 Cal.App.4th at p. 297; *Pantoja, supra*, 198 Cal.App.4th at p. 114; *Johnson, supra*, 173 Cal.App.4th at p. 761.) Moreover, to the extent any employees complained about Maldonado, that evidence tended to prove LBMMC's knowledge of Maldonado's conduct, which was relevant to Taylor's failure to prevent and negligent supervision claims. (*Bihun, supra*, 13 Cal.App.4th at pp. 988-989.) While LBMMC argues there was insufficient evidence that any of Maldonado's actions toward these employees was independently wrongful, it has cited no authority requiring that "me too" evidence amount to independently actionable conduct. (Cf. *Johnson, supra*, at p. 767 [requiring only that other acts be "sufficiently similar" to the plaintiff's situation to be relevant as "me too" evidence].)

---

[9] The exception is the testimony from Rodriguez, who was never disciplined for taking family leave and who did not believe her incident of discipline after her bereavement leave was retaliatory. But this portion of her testimony was only a tiny fraction of the evidence at trial and, in fact, tended to support LBMMC's position that Maldonado did not intentionally retaliate against Taylor. We can perceive of no possible prejudice from its admission.

23

The trial court also acted within its discretion in finding the probative value of this evidence was not substantially outweighed by the undue consumption of time, or the danger of unfair prejudice, confusing the issues, or misleading the jury. (Evid. Code, § 352.) Most of this evidence was not strongly probative of Maldonado's retaliatory intent or of LBMMC's knowledge of Maldonado's actions, but there was also nothing particularly inflammatory about any of the testimony from the former employees. Some of it even tended to favor LBMMC, such as Stone testifying she was "fine" with Maldonado and Connor testifying she did not believe Maldonado ever mistreated her.

Finally, even if the trial court erred in admitting this evidence, LBMMC suffered no miscarriage of justice as a result. As already discussed and apart from these witnesses' testimony, there was significant direct and circumstantial evidence of Maldonado's retaliatory animus based on Maldonado's comments and actions directed toward Taylor herself, and that LBMMC already knew about Maldonado's conduct from Taylor's own complaints. (*Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1161 [finding no prejudice from admission of other acts of misconduct because other evidence demonstrated employer's actual knowledge of harasser's conduct].) Any error does not warrant reversal.

## C. *Instructional Errors*

LBMMC argues the trial court gave the jury prejudicially erroneous instructions defining adverse employment action, retaliation, and recoverable items of economic damage. "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) However, reversal is not warranted for erroneous instructions "'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'" (*Id.* at p. 580, quoting Cal. Const., art. VI, § 13.) In assessing prejudice, we must evaluate "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580-581.)

24

*i. Adverse Employment Action Instruction*

At the time the jury was instructed, there was no model instruction on the definition of an adverse employment action, so the parties proposed their own instructions. As relevant here, LBMMC requested the following instruction: "'Adverse employment action' means action by the employer that causes a substantial and material adverse effect on the terms, conditions or privileges of an employee's employment. The action must be more disruptive than an inconvenience or an alteration of job responsibilities. The employment action must be both detrimental and substantial. [¶] The significance of particular types of adverse actions must be evaluated by taking into account the legitimate interests of both the employer and the employee. Minor or relatively trivial adverse actions that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment. A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient. Oral or written criticisms of an employee, trivial slights and negative job evaluations do not constitute adverse employment actions."

The parties could not resolve their differences and discussed their disagreements at length with the trial court. Ultimately, LBMMC's counsel agreed to alter the phrase "substantial *and* material" in its proposed instruction to "substantial *or* material" and agreed to delete the final sentence, "Oral or written criticisms of [an] employee, trivial sl[i]ghts, and negative job evaluations do not constitute adverse employment actions." The parties also changed the phrase "detrimental *and* substantial" to "detrimental *or* substantial" based on the change of the "material or substantial" language.

The trial court eventually instructed the jury as follows: "'Adverse employment action' means action by the employer that causes a substantial or material adverse effect on the terms, conditions or privileges of an employee's employment. The action must be more disruptive than an inconvenience. The employment action must be either detrimental or substantial. [¶] The significance of particular types of adverse actions must be evaluated by taking into account the legitimate interests of both the employer and

25

the employee.  Minor or relatively trivial adverse actions that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment.  A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient."

LBMMC now argues its proposed changes to the final instruction adopted by the trial court rendered the instruction incorrect.  We find no error.[10]

In support of its claim the "substantial or material" and "detrimental or substantial" phrases should have been stated in the conjunctive, LBMMC cites *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1459 (*Akers*), but in that case the court found instructional error because the trial court did not define "adverse employment action" at all, not because the instruction stated an adverse action had to be "substantial *or* material."  Nor did *Yanowitz* indicate that an adverse employment action must be both material and substantial or substantial and detrimental, as opposed to simply material. (See *Yanowitz, supra*, 36 Cal.4th at pp. 1052-1054.)  We note the model instruction drafted since trial in this case only requires an adverse action "materially and adversely" affect the terms and conditions of employment.[11]

---

[10]     Taylor has not argued on appeal LBMMC's challenges fail because it invited these errors and we do not address that issue.

[11]     CACI No. 2509 states:  "[*Name of plaintiff*] must prove that [he/she] was subjected to an adverse employment action.  [¶]  Adverse employment actions are not limited to ultimate actions such as termination or demotion.  There is an adverse employment action if [*name of defendant*] has taken an action or engaged in a course or pattern of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of [*name of plaintiff*]'s employment.  An adverse employment action includes conduct that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion.  However, minor or trivial

26

LBMMC's argument fairs no better with regard to the omission of the sentence, "Oral or written criticisms of an employee, trivial slights and negative job evaluations do not constitute adverse employment actions," because this was an incorrect statement of law. While *on their own* these acts might not be actionable (*Akers, supra*, 95 Cal.App.4th at p. 1457; *Pinero v. Specialty Restaurants Corp.* (2005) 130 Cal.App.4th 635, 646), they can be considered as part of a "pattern of systematic retaliation" for protected conduct (*Yanowitz, supra*, 36 Cal.4th at p. 1055). (See *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424.) LBMMC's proposed instruction would have directed the jury to ignore Taylor's evidence of unwarranted discipline and negative evaluations, which was plainly improper under *Yanowitz*. Thus, the trial court properly removed it from the final instruction.

*ii. Retaliation Instruction*

The parties jointly requested CACI No. 2505, which defined retaliation as follows: "Rashawna Taylor claims that Long Beach Memorial Medical Center retaliated against her for complaining about unlawful harassment, discrimination or retaliation. To establish this claim, Rashawna Taylor must prove all of the following: [¶] 1. That Rashawna Taylor complained about unlawful harassment, discrimination or retaliation; [¶] 2. That Long Beach Memorial Medical Center subjected Rashawna Taylor to an adverse employment action or action [*sic*]; [¶] 3. That Rashawna Taylor's complaint about unlawful harassment, discrimination or retaliation was a motivating reason for Long Beach Memorial Medical Center's decision to impose an adverse employment action; [¶] 4. That Rashawna Taylor was harmed; and [¶] 5. That Long Beach Memorial Medical Center's conduct was a substantial factor in causing Rashawna Taylor's harm."

After the verdict but before judgment was entered in this case, the court in *Joaquin* opined in dicta this instruction was inadequate because it did not expressly require the

actions or conduct that is not reasonably likely to do more than anger or upset an employee cannot constitute an adverse employment action."

27

jury to find retaliatory intent, an "essential element of a cause of action for unlawful retaliation under FEHA." (*Joaquin, supra*, 202 Cal.App.4th at pp. 1229-1231.) LBMMC cited *Joaquin* in a footnote of its motion for JNOV to argue the instruction given in this case was similarly incorrect, but the trial court rejected the contention. We find no error warranting reversal.[12]

In *Joaquin*, the employee complained about sexual harassment and was terminated because the employer determined the complaints were false. (*Joaquin, supra*, 202 Cal.App.4th at pp. 1215-1216.) "On this unusual set of facts, the relevant legal question is whether an employee may be disciplined if his or her employer concludes that the employee has fabricated a claim of sexual harassment, or whether such a complaint is insulated from discipline even where, as here, the employer determines that it was fabricated." (*Id.* at pp. 1221-1222.) The court concluded the employee may be disciplined under these circumstances and found no substantial evidence to demonstrate retaliatory animus or that the reason for the employee's discipline was pretext. (*Id.* at p. 1226.) The court went on to express concern about the omission of the intent element from CACI No. 2505 because, "under the unique facts of the present case, the instruction may have made a plaintiff's verdict inevitable." (*Joaquin*, at pp. 1230-1231.) In other words, because CACI No. 2505 did not expressly require a finding of animus, the jury could have concluded all the elements listed in CACI No. 2505 were met even while also believing the employee's complaint was fabricated. (*Id.* at p. 1231.)

Here, by contrast, there was no dispute Taylor complained repeatedly and LBMMC presented no evidence those complaints were fabricated. Indeed, in closing argument LBMMC's counsel conceded Taylor complained and directed the jury to respond "yes" to that question on the special verdict form. Under CACI No. 2505 as given to the jury, the only way the jury could have found for Taylor on this claim was if Taylor's complaints, the veracity of which were unchallenged, motivated Maldonado and LBMMC to take an adverse employment action against her. Thus, unlike in *Joaquin*,

---

[12]     We find LBMMC has preserved this contention on appeal.

28

CACI No. 2505 did not allow the jury to find in Taylor's favor without also finding retaliatory intent.[13]

Even if CACI No. 2505 was incomplete, LBMMC suffered no prejudice as a result. As already explained, Taylor offered significant direct and circumstantial evidence of retaliatory animus. Further, although Taylor's counsel did not expressly argue in closing that Maldonado acted with retaliatory intent, LBMMC's counsel argued Taylor's theory was that "Ms. Maldonado didn't like people with sick kids and was counting protected absences against" Taylor, and that she got "mad" at Taylor for taking protected absences, implying the jury would have to find Maldonado intended to retaliate in order to render a verdict for Taylor. Further, in variance with the instruction read to the jury, the special verdict form specifically asked the jury to decide, "Did Long Beach Memorial Medical Center take one or more adverse employment actions against Rashawna Taylor *because she complained* about harassment or discrimination associated with taking protected leave of absence for her daughter, a person having a serious health condition (asthma)?" (Italics added.) By a margin of 11 to one, the jury answered, "Yes," suggesting the jury had little trouble actually finding retaliatory intent.

*iii. Economic Damages Instruction*

As to economic damages, the trial court instructed the jury, "The following are the specific items of economic damages claimed by Rashawna Taylor: past and future

---

**13** Indeed, after *Joaquin* was decided, the Judicial Council of California declined to change CACI No. 2505, explaining the instruction given in that case "is correct for the intent element in a retaliation case. However, in cases such as *Joaquin* that involve allegations of a prohibited motivating reason (based on a report of sexual harassment) and a permitted motivating reason (based on a good faith belief that the report was falsified), the instruction may need to be modified to make it clear that plaintiff must prove that defendant acted based on a *prohibited* motivating reason and not the *permitted* motivating reason." (Directions for Use to CACI No. 2505 (June 2013 rev.) (2014) p. 1366.)

earnings."  In attacking this instruction, LBMMC reiterates its arguments that Taylor failed to prove she was "constructively discharged" and insufficient evidence supported her claim for economic damages.  For the reasons already explained, we reject these contentions and find no instructional error.

## 2.  Costs

Of the $88,488.59 in costs awarded by the trial court, LBMMC challenges the following costs on appeal:  (1) $21,821.36 in expert witness fees; (2) $6,962.50 in mediation fees; (3) $10,413.16 in costs for videotaping and synchronizing depositions; (4) $7,449 in court reporter fees misclassified as jury fees; and (5) $11,660.90 in other expenses (including the $6,962.50 in mediation fees) misclassified as "attachment expenses."  We find no error.

"The right to recover any of the costs of a civil action 'is determined entirely by statute.'"  (*Anthony v. City of Los Angeles* (2008) 166 Cal.App.4th 1011, 1014 (*Anthony*).)  Pursuant to Code of Civil Procedure section 1032, "a prevailing party is entitled 'as a matter of right' to recover costs in any action or proceeding."  (*Anthony*, at p. 1014.)  In turn, Code of Civil Procedure section 1033.5 "specifies the items that are 'allowable as costs under Section 1032.'  ([Code Civ. Proc.,] § 1033.5, subd. (a).)"  (*Anthony*, at p. 1015.)  Even allowable costs may be withheld if they are not "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation."  (*Perko's Enterprises, Inc. v. RRNS Enterprises* (1992) 4 Cal.App.4th 238, 244-245.)

"If the items appearing in a cost bill appear to be proper charges, the burden is on the party seeking to tax costs to show that they were not reasonable or necessary.  On the other hand, if the items are properly objected to, they are put in issue and the burden of proof is on the party claiming them as costs."  (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774 (*Ladas*).)  We review for abuse of discretion whether a costs award is reasonable, but "because the right to costs is governed strictly by statute [citation][,] a court has no discretion to award costs not statutorily authorized. [Citations.]"  (*Ibid.*)

30

## A. *Expert Witness Fees*

"Among the items allowable as costs [under Code of Civil Procedure section 1033.5] are . . . fees of expert witnesses ordered by the court. ([Code Civ. Proc., § 1033.5,] subd. (a)(10), (8).) Section 1033.5 specifies that '[f]ees of experts not ordered by the court' are 'not allowable as costs, except when expressly authorized by law.' (§ 1033.5, subd. (b)(1).)" (*Anthony, supra*, 166 Cal.App.4th at p. 1015.) The trial court did not order Taylor's expert witnesses, so in her memorandum of costs Taylor sought expert witness fees pursuant to Code of Civil Procedure section 998. Later in her opposition to LBMMC's motion to tax costs, she also sought these fees pursuant to the FEHA, section 12965, subdivision (b). LBMMC contends Taylor was not entitled to expert witness fees under either statute. While we agree she was not entitled to fees under Code of Civil Procedure section 998, she was entitled to recover these fees under the FEHA.

"[Code of Civil Procedure] [s]ection 998 provides that not less than 10 days prior to trial, any party 'may serve an offer in writing upon any other party to the action to allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated.' ([Code Civ. Proc.,] § 998, subd. (b).) If the offer is accepted, the court 'shall enter judgment accordingly.' (*Id.*, subd. (b)(1).) If the offer is *not* accepted prior to trial or within 30 days after it is made, whichever occurs first, 'it shall be deemed withdrawn.' (*Id.*, subd. (b)(2).) " (*One Star, Inc. v. STAAR Surgical Co.* (2009) 179 Cal.App.4th 1082, 1089.) When the plaintiff is the offeror and the defendant fails to obtain a judgment more favorable than the offer, "the court has discretion to require the defendant to pay plaintiff's postoffer costs for the services of expert witnesses. ([Code Civ. Proc.,] § 998, subd. (d).)" (*Marcey v. Romero* (2007) 148 Cal.App.4th 1211, 1215 (*Marcey*).) However, a Code of Civil Procedure section 998 offer revoked before the expiration of the statutory 30-period "forfeits its status as an 'offer' under the remaining provisions of [Code of Civil Procedure] section 998," and the offeror no longer has the right to recover statutory expert witness fees. (*Marcey*, at pp. 1215-1217; see also *One*

31

*Star, supra*, at p. 1091; *Marina Glencoe, L.P. v. Neue Sentimental Film AG* (2008) 168 Cal.App.4th 874, 880.)

Here, Taylor sent LBMMC a Code of Civil Procedure section 998 offer on October 18, 2010, and revoked it on November 8, 2010, before the expiration of 30 days, rendering it no longer an "offer" for the purposes of entitlement to expert witness fees under Code of Civil Procedure section 998. It does not matter, as Taylor contends, that she believed LBMMC's silence on the offer meant it never intended to accept it; Taylor presented no evidence LBMMC unequivocally rejected the offer. (See *Guzman v. Visalia Community Bank* (1999) 71 Cal.App.4th 1370, 1374.) By revoking the offer before the statutory 30-day period expired, Taylor forfeited her right to recover Code of Civil Procedure section 998 expert witness fees. (*Marcey, supra*, 148 Cal.App.4th at pp. 1215-1217.)

Under the FEHA, a court has discretion to award expert witness fees to the prevailing party. (§ 12965, subd. (b) ["In civil actions brought under this section, the court, in its discretion, may award to the prevailing party, including the department, reasonable attorney's fees and costs, including expert witness fees."]; *Anthony, supra,* 166 Cal.App.4th at p. 1014.) In *Anthony*, this Division determined FEHA expert witness fees need not be sought within the 15-day time limit for filing a memorandum of costs, and may be requested by way of a noticed motion timely filed pursuant to the FEHA. We did not address whether a prevailing party *must* seek those fees in a separate motion rather than in a memorandum of costs. (*Anthony, supra*, at pp. 1015-1017.)

LBMMC urges us to extend *Anthony* to hold Taylor could not have obtained expert fees in her memorandum of costs and had to file a separate motion to recover them. We need not decide that issue because LBMMC suffered no conceivable prejudice even if Taylor followed the incorrect procedure. After Taylor cited the FEHA in her opposition to LBMMC's motion to tax costs, LBMMC responded to the issue in its reply brief and argued the issue at the hearing on the motion. LBMMC would have had the same opportunity to contest Taylor's request in an opposition brief and at a hearing had she filed a separately noticed motion. (See *California Recreation Industries v. Kierstead*

32

(1988) 199 Cal.App.3d 203, 209 [finding no prejudice when plaintiff erroneously sought attorney fees in memorandum of costs instead of through a noticed motion because defendants "obtained all the procedural protection which they would have enjoyed had plaintiffs initiated their claim for attorney's fees by noticed motion"].)

For these same reasons, we reject LBMMC's argument it was prejudiced because Taylor's belated request under the FEHA was untimely under rule 3.1700 of the California Rules of Court. LBMMC does not dispute she timely requested the fees themselves in her memorandum of costs; and as we have explained, LBMMC suffered no prejudice from her belatedly citing the FEHA as a justification for them.

Finally, LBMMC challenges the reasonableness of $442.50 in expert fees Taylor incurred consulting with workplace investigation expert Carla Barboza. Taylor contemplated using her as an expert witness with respect to two of LBMMC's witnesses, Edwards and Garneff, but Taylor ultimately did not designate her or call her as a trial witness. Although LBMMC argues Taylor failed to offer evidence Barboza was qualified as an expert, her hourly rate was reasonable, or she was a potential witness, the trial court reasonably credited Taylor's counsel's declaration and the supporting invoice setting forth Barboza's hourly rate in finding sufficient justification for this cost. We find no abuse of discretion.

## B. Mediation Expenses

In her memorandum of costs, Taylor sought $6,926.50 for her share of expenses for two private voluntary mediations, one occurring before she filed her lawsuit and the other occurring during litigation. She conceded she improperly designated those costs as "attachment expenses" under item No. 6 in her memorandum of costs and requested they be considered "other" expenses under item No. 13. Although LBMMC argues this reclassification rendered her request untimely, we disagree. Taylor timely sought these mediation fees; she simply inadvertently included them in the wrong category. LBMMC has pointed to no prejudice from Taylor's mistake and we can identify none.

LBMMC also challenges the award of mediation expenses on the merits. Expenses that are neither allowed nor prohibited under Code of Civil Procedure section

33

1033.5, subdivisions (a) and (b) are recoverable in the trial court's discretion, provided they are "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation." (Code Civ. Proc., § 1033.5, subd. (c)(2), (4); *Ladas, supra,* 19 Cal.App.4th at p. 774.) "Whether a cost is 'reasonably necessary to the conduct of the litigation' is a question of fact for the trial court, whose decision will be reviewed for abuse of discretion." (*Gibson v. Bobroff* (1996) 49 Cal.App.4th 1202, 1209 (*Gibson*).) In *Gibson*, the court held expenses for *court-ordered* mediation fall into that category and should be recoverable because shifting those expenses would encourage parties to settle to avoid the cost and time consumed by trial. It expressly declined to decide whether voluntary mediation expenses should be similarly recoverable. (*Id.* at p. 1209, fn. 7.)

Here, even though the parties' mediations were voluntary and one occurred before Taylor filed her lawsuit, appellant has not demonstrated the trial court abused its discretion in awarding those costs in this case. As in *Gibson*, shifting voluntary mediation expenses would encourage early mediations and settlements just as shifting costs for court-ordered mediations would. A trial court is in the best position to determine whether recovery of prelawsuit mediation costs is reasonably necessary in any particular case. We reject LBMMC's interpretation of the statutory phrase "reasonably necessary to the litigation" to be a blanket preclusion of a costs award for prelawsuit mediation expenses. *Gibson* rejected an equally "distorted, myopic view" that mediation costs are not "reasonably necessary to the conduct of litigation" because "[e]ncouraging the parties to resolve lawsuits at the earliest time and before a costly and time-consuming trial, is a necessary part of litigation as conducted in this state." (*Gibson, supra*, 49 Cal.App.4th at p. 1209.) We find no abuse of discretion here.[14]

---

[14] LBMMC contends Taylor violated several provisions of the Evidence Code by disclosing that, in the second mediation, the mediator's proposal was less than the ultimate judgment. Whether or not that disclosure violated the Evidence Code is

34

## C. Deposition Videotaping and Synchronization Expenses

Code of Civil Procedure section 1033.5, subdivision (a)(3) allows an award of expenses for "[t]aking, video recording, and transcribing necessary depositions including an original and one copy of those taken by the claimant and one copy of depositions taken by the party against whom costs are allowed, and travel expenses to attend depositions." LBMMC challenges the reasonableness of the trial court's award of $10,413.16 in costs for videotaping and synchronizing depositions[15] because Taylor did not use any of the recorded depositions at trial. The court in *Seever v. Copley Press, Inc.* (2006) 141 Cal.App.4th 1550, 1557 (*Seever*), rejected the same argument, allowing an award of costs for videotaping depositions not used in trial because the opposing party also did not use videotaped depositions at trial; the videotaped depositions were necessary to prepare to cross-examine the most important witness in the case; and counsel who took the depositions was not trial counsel and the videotaped depositions enabled the new counsel to review witness demeanor.

Although the facts here are somewhat different, we reach the same conclusion. Taylor's counsel attested that the videotaped depositions were important because they were available for court-ordered settlement conferences and, in his extensive experience, he could not predict witnesses' testimony or which witnesses would be available at trial. More importantly, he fully intended to use videotaped depositions to impeach testifying witnesses, but the trial court unexpectedly sustained LBMMC's objections and disallowed them. While the trial court would have allowed the videotaped deposition of

---

irrelevant to whether the mediation itself was "reasonably necessary to the conduct of litigation" for the purpose of cost recovery.

[15]    There is an inconsistency in the record regarding the $170.66 in synchronization costs. Taylor stated in her opposition to LBMMC's motion to tax costs she was not seeking those costs, but her counsel attested she was. The trial court awarded those costs and the parties have not separately addressed them on appeal. We will therefore treat them together with the costs for videotaping depositions.

unavailable witness Corona, by the end of Taylor's case-in-chief, Taylor's counsel determined her testimony was unnecessarily redundant. As in *Seever*, the trial court did not abuse its discretion in accepting Taylor's counsel's explanation and finding the expenses for videotaped depositions were "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation." (Code Civ. Proc., § 1033.5, subd. (c)(2).)

### D. Improperly Classified Costs

Finally, LBMMC attacks two categories of costs Taylor misclassified in her memorandum of costs: (1) $7,449 included for "jury fees" under item No. 2, which Taylor requested be reclassified as court reporter's fees under item No. 12; and (2) $11,660.90 in various costs listed as "attachment expenses" under item No. 6 (including mediation fees, subpoena fees, messenger fees, witness parking, trial consultation fees, and trial A/V equipment), which Taylor requested be reclassified as "other expenses" under item No. 13. Although LBMMC claims this reclassification renders Taylor's request for these fees untimely, as we already noted with regard to mediation fees, Taylor timely sought the fees; she merely incorrectly classified them. Once again, LBMMC identified no prejudice from Taylor's mistake and we can identify none. The trial court did not abuse its discretion in awarding these fees.

## 3. Attorney Fees

Taylor challenges the trial court's award of $484,687.50 in attorney fees on various grounds. We agree the trial court abused its discretion in several respects, so we reverse the trial court's order and remand for recalculation pursuant to our discussion.

### A. Background

Under the FEHA attorney fees provision, Taylor sought an initial "lodestar" amount of $1,675,627.50 with a 2.0 multiplier, for a total of $3,351,255. The lodestar was calculated as follows: Bernard Alexander, 1,346.13 hours at $675 per hour; Twila White, 1,370.7 hours at $475 per hour; Tracy Fehr, 200.8 hours at $425 per hour; Gustin Ham (legal assistant), 155.8 hours at $175 per hour; and Sonia Chaisson (attorney consultant), 6 hours at $550 per hour. Taylor sought a 2.0 multiplier because of the

36

contingent risk, preclusion of other work, difficulty of the case and skill involved, and the results obtained. The motion was well-supported by detailed billing records; declarations from Taylor's attorneys explaining their backgrounds, the time they expended on the case, and their hourly rates; and declarations of other employment attorneys attesting to the reasonableness of the fees sought.

After limited discovery, LBMMC opposed Taylor's motion, contending reasonable fees were $242,344 and submitting a detailed declaration from an attorney fees expert, André E. Jardini. Jardini calculated a reasonable attorney fee award between $484,687.50 at the low end and $868,342.62 at the high end. To calculate his low-end figure, he reduced the hours billed to 1,292.5 by undertaking a high-level review of broad categories of litigation activities he thought were excessively billed, and he came up with a blended "average" hourly rate for Taylor's attorneys of $375. To come up with his high-end figure, he reduced Taylor's compensable hours to 2,286.73 by identifying and excising specific hours in Taylor's billing records related to duplication of effort, billing errors, vague entries, and clerical activities, etc., again multiplied by the blended "average" hourly rate of $375. He also recommended no multiplier because, in his view, Taylor's counsel's significant experience eliminated the novelty of the issues, there was no public benefit, and other work likely was not precluded.

In reply, Taylor objected to Jardini's declaration on several grounds, including he lacked expertise and he was biased against her counsel Twila White due to a prior cocounsel relationship that ended in conflict. In response to these arguments, Jardini submitted a supplemental declaration defending his qualifications and experience and denying he harbored any bias against White.[16]

---

**16** At the hearing on Taylor's fee motion, Taylor objected to the belated submission of Jardini's supplemental declaration. The trial court indicated it had not seen the supplemental declaration at that time and allowed the parties to argue assuming the court would consider it. The court did not expressly rule on this objection.

37

The court heard the motion, noting the amount requested was "very, very high" and sought to fix an amount that was "fair." It preliminarily explained several points impacting its analysis: the verdict was much lower than the fees sought by Taylor's counsel and Taylor did not prevail on all of her claims; the court had seen the litigation from the beginning; the other attorneys who submitted declarations in Taylor's favor supported her requested hourly rates and multiplier, but did not give opinions on the hours expended because they had not reviewed her counsel's billing records; the court was mindful of the fees expended by LBMMC to defend the case; and it was not inclined to award any multiplier. After hearing from the parties, the court took the motion under submission, and later issued a cursory order without analysis awarding Taylor $484,687.50 in fees, exactly the low-end amount proposed by Jardini.

## B.  Legal Standard

As we have noted, under the FEHA, "the court, in its discretion may award the prevailing party . . . reasonable attorney's fees and costs . . . ." (§ 12965, subd. (b).)  The trial court must determine the familiar "lodestar" figure "'based on a careful compilation of the time spent by, and the reasonable hourly compensation for, each attorney, and the resulting dollar amount is then adjusted upward or downward by taking various relevant factors into account.'" (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 985.)  An award of fees is reviewed for abuse of discretion. (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393 (*Horsford*).)

"'The basic, underlying purpose of FEHA is to safeguard the right of Californians to seek, obtain, and hold employment without experiencing discrimination' on account of [protected characteristics]. [Citation.]  ""Without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible.'"  [Citation.]  The award of reasonable attorney fees accomplishes 'the Legislature's expressly stated purpose of FEHA "to provide effective remedies that will eliminate these discriminatory practices." [Citation.]' [Citation.]  [¶]  In order to be effective in accomplishing the legislative purpose of assuring the availability of counsel to bring meritorious actions under FEHA, the goal of

38

an award of attorney fees 'is to fix a fee at the fair market value for the particular action.' [Citation.] '[F]ee awards should be fully compensatory.' [Citation.] '[A]bsent circumstances rendering the award unjust, an attorney fee award should ordinarily include compensation for *all* the hours *reasonably spent*' in litigating the action to a successful conclusion. [Citation.] 'Reasonably spent' means that time spent 'in the form of inefficient or duplicative efforts is not subject to compensation.' [Citation.]" (*Horsford, supra*, 132 Cal.App.4th at p. 394.)

## C. Analysis

On appeal, Taylor contends the trial court erred in several respects: (1) the court erred by not expressly employing the lodestar method; (2) the court improperly accepted Jardini's legally erroneous methodology; (3) the court failed to analyze whether an enhancement was warranted; and (4) the court did not address Taylor's objections to Jardini's qualifications and alleged bias. We agree in part with Taylor's contentions, requiring remand for the trial court to exercise its discretion to set a fee award in line with the proper standards set forth in our opinion. (See *Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 159 (*Graciano*).)

### i. Lodestar Method

We reject Taylor's argument reversal is required because the trial court failed to explicitly employ the lodestar method in fixing fees. The trial court was not required to provide reasoning in its order granting fees to Taylor, and it appears the court accepted Jardini's analysis in awarding fees that precisely coincided with his low-end recommendation. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140 (*Ketchum*) [no statement of decision on fee award required unless requested and "'"[a]ll intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown"'"].) Jardini applied the lodestar analysis by offering his opinions about the reasonable number of hours and reasonable hourly rates. We find his analysis flawed in several respects, but we will not reverse because the trial court failed to expressly employ the lodestar analysis.

39

*ii. Reasonable Hourly Rates*

Jardini's opinion on the reasonable hourly rates for Taylor's attorneys was erroneous in two ways. First, he improperly averaged what he believed to be reasonable hourly rates, yielding a uniform hourly rate of $375 for all of Taylor's attorneys. The trial court must determine the "'reasonable hourly compensation of *each attorney . . .* involved in the presentation of the case.'" (*Ketchum, supra*, 24 Cal.4th at p. 1132, italics added.) By averaging all the attorneys' hourly rates, Jardini failed to set rates based on the "'fees customarily charged by that attorney and others in the community for similar work.'" (*Bihun, supra*, 13 Cal.App.4th at p. 997.) His method was particularly problematic in this case because the partners billed significantly more hours than the associate on the case, resulting in a far lower value than if Jardini had used hourly rates specific to each attorney.[17]

Second, the rates Jardini used to create his "average" hourly rate were not the prevailing rates in the Los Angeles community where Taylor's attorneys practice and where the trial took place. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 ["The reasonable hourly rate is that prevailing in the community for similar work."].) Jardini's only evidence came from a survey of hourly rates for small firms across all of California, not Los Angeles, where Taylor's counsel was located. (*Id.* at p. 1096 [approving use of rates in San Francisco, where counsel was located].) "As [this] survey[] did not focus on Los Angeles County, where this litigation arose and this case was tried, [it is] of little, if any relevance" to fixing reasonable hourly rates. (*Cordero-Sacks v. Housing Authority of City of Los Angeles* (2011) 200 Cal.App.4th 1267, 1286.) Nor did this survey focus on rates by attorneys practicing employment law, which could produce rates different from lawyers practicing other specialties. (*PLCM Group, supra*, at p. 1095; *Graciano, supra*, 144 Cal.App.4th at p. 156 [faulting trial court's hourly rate

---

**17** Although Taylor suggests otherwise, Jardini did not include paralegal rates in his average.

40

in consumer fraud case because it did not account for "*comparable* professional legal services, that is, services rendered by counsel on consumer fraud issues"].)[18]

Although the trial court abused its discretion in relying on Jardini's opinion for hourly rates, there was other evidence from both parties on reasonable hourly rates. The trial court is free to evaluate this evidence in setting reasonable hourly rates on remand in accordance with our opinion.

*iii. Reasonable Number of Hours*

Jardini proposed two different numbers as the reasonable hours expended by Taylor's counsel. His first number, 1,292.5 hours, was based on his macro-level review of "all of the events in the litigation," such as trial attendance, depositions, motions, pleadings, conferences, and discovery, plus a 25 percent allowance in "transactional costs." His second number included nearly a thousand more compensable hours for a total of 2,286.73 hours, which he reached by "perform[ing] a specific issue based analysis of the time records submitted by [Taylor's] counsel," meaning he identified "billing issues and a precise qualification of each such issue before any suggested reduction is made." In his view, this analysis "likely results in an amount which is beyond that which is reasonable because it gives the benefit of the doubt to counsel for any entry in the billing record and no reduction is made unless a specific reason can be identified for that reduction." This methodology led him to identify 720.8 hours in Taylor's billing invoices as excessive, erroneous, and vague, or work more properly billed as overhead and clerical or paralegal work.

The trial court appears to have adopted the first number of 1,292.5 hours, and it abused its discretion in doing so because that number was not supported by the record and was manifestly unreasonable. By explaining how he reached his second number, Jardini implicitly admitted his first number was not based on any of Taylor's counsel's

---

[18] We do, however, reject Taylor's argument that Jardini's survey improperly focused on rates charged by attorneys at small firms because Taylor has cited no specific authority to support that point under California law.

41

actual billing entries, rather than his unsupported conjecture about how much time certain tasks should take, notwithstanding he was not part of this litigation until the trial was completed and the judgment entered. Even the chart he cited to justify this number reflects a reduction of hours to, at most, 1,904.42 (2,406.65 hours billed minus 502.2 hours reduced), not his proposed 1,292.5 hours. Lacking any supporting calculations or evidence, Jardini seems to have simply plucked the number out of the air. Indeed, LBMMC's counsel spent 1,794.9 hours on this case only until 2011 with comparable staffing, and surely more in 2012 not reflected in its billing invoices, and yet lost the case. It defies explanation how Taylor's counsel could have expended only 72 percent of the hours LBMMC's counsel expended when Taylor bore the burden of proof and won a substantial verdict after a lengthy jury trial.

Taylor attacks, and LBMMC defends, Jardini's specific reductions leading to his second number of 2,286.73 hours. When the trial court awarded fees apparently based on Jardini's first number, it did not appear to rule on those specific reductions and we decline to determine in the first instance whether those reductions were reasonable. Having found the trial court abused its discretion in finding Taylor's attorneys expended only 1,292.5 hours, we direct the trial court on remand to review the specific reductions Jardini proposed for his second number alongside Taylor's evidence of the reasonable hours expended by her attorneys to determine whether any reductions are warranted.

*iv. Adjustment of Lodestar and Remaining Evidentiary Objections*

Taylor complains the trial court failed to engage in any analysis of the factors that would justify an enhancement of the lodestar and the trial court took several other factors into account to improperly reduce the lodestar. (See *Ketchum, supra*, 24 Cal.4th at p. 1132 [listing factors that might justify an enhancement of the lodestar amount].) Taylor also argues the trial court failed to consider her additional objections to Jardini's opinions that he was not qualified as an expert and he was biased against one of her attorneys. LBMMC argues the trial court erred by not ruling on its objections to Taylor's evidence.

42

Because we remand the attorney fees award for recalculation of the lodestar, we decline to address these additional issues.  On remand, the trial court is free to consider the parties' objections to evidence and to consider whether any adjustment of the lodestar is warranted.

## DISPOSITION

We affirm the judgment and award of costs to Taylor.  We reverse the award of attorney fees to Taylor and remand for consideration of the attorney fees in light of our opinion.  Taylor shall recover her costs, including reasonable attorney fees, in all three appeals.


FLIER, J.

WE CONCUR:



BIGELOW, P. J.                    GRIMES, J.

---
<sup>*</sup>     BIGELOW, P. J.                                        FLIER, J.

43